## Adams et al. v. Commonwealth.

(Decided December 21, 1928.)

S. D. LEWIS for appellants.

J. W. CAMMACK, Attorney General, and JAS M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Appellants, Lawrence and Smith Adams, who were defendants in the indictment, were convicted at their trial in the Rockcastle circuit court of the offense of confederating and banding "themselves together for the purpose of intimidating, alarming, disturbing or injuring" T. C. Rimel, an offense denounced by section 1241a-1 of the 1922 edition of Carroll's Kentucky Statutes, and their punishment was fixed at confinement in the penitentiary for one year each. Their motion for a new trial was overruled, and this appeal by them seeks a reversal of the judgment upon the sole ground of the insufficiency of the evidence to show that defendants confederated and banded themselves together, which is the gravamen of the offense.

256

The prosecuting witness, Rimel, was a man considerably older than defendants, and he had a son who was something near their age.. Late one afternoon Rimel went to Burdine's store for the purpose of procuring some household supplies, and in doing so he met defendant Lawrence Adams near Brindle Ridge Church, where they had some conversation. About the time the prosecuting witness resumed his journey to the store, his son appeared, and witness requested him to go home, but Lawrence attempted to persuade the son to remain, when witness said (using his own language): "Lawrence, you go on and attend to your own business, I am not going to have him (his son) running all over the town or country." He then started to the store and remained there something over an hour and until quite late in the day. The church house at Brindle Ridge was located some 15 or 20 feet from the road, with steps leading from the ground up to the front door. As witness returned, he found both defendants close to the road and at the front of the church. What then happened is thus told by him: "As I came back and got right even with the church house, Smith Adams and Lawrence jumped in front of me, Smith had a stick and jumped at me and cursed and said he was going to burst my brains out, Lawrence came on the other side of the horse and had his hands to his back and said jump. . . . Smith had a club he began to curse me and said he was going to beat my brains out, he ran at my horse and as he struck at me, my horse jumped and the leather broke, and I fell off, and struck this shoulder, and by the time I got up Smith was behind on the other side and struck at me again and when I got up he made a long lick, I ran under the stick, and a rock was lying there and I picked it up and threw it and knocked him down and that settled it."

He was corroborated by two witnesses residing nearby, and who were located so as to enable them to see and hear what happened. Another witness, who saw and heard part of the conversation at the first meeting of prosecuting witness and Lawrence Adams, testified that the latter passed along the road from that place toward his home and told witness about what had happened and what Rimel had said to him, and that he then said, "B—— G—— I will get Smith hold of him, we will waylay him," and at that time witness saw Smith coming from his home towards his brother, and when they met they turned around and went back towards the church. Lawrence Adams practically admitted that conversation,

but gave as a reason for his statement that the witness Burdine was "deviling me." He also testified that he met his brother and they turned back to go to church under the belief that there were to be services there that night. It appears, however, that they were the only persons in that neighborhood, so far as the record shows, who were so deceived. When they got to the church, it was dark, and no one was there, but, notwithstanding they were alone, they tarried until the prosecuting witness returned from the store. Smith Adams admitted that he spoke the first words there in front of the church, and which he thus stated in his testimony: "I said I did not think we had ever done anything to him. And he got mad and his saddle stirrup broke and Lawrence was standing there and he began cursing me. He said he was going to get down and burst my God damn brains out, Lawrence got down and handed the saddle stirrup to me, I started on home, he said wait a minute and I will settle this he got off his horse there, and there was a big rock, he grabbed two rocks and we picked up a stick, I picked up the stick."

His other testimony is very confusing as to when or how the prosecuting witness got off his horse, or at what stage of the melee he procured the rock; and the same is true as to the testimony of Lawrence Adams; but they each admitted that the stirrup strap of the saddle was in some manner broken. Both defendants deny any agreement or confederation to harm the prosecuting witness; but we think the jury was justified from the facts that we have so briefly outlined in concluding otherwise. Lawrence was considerably angered at what occurred at the first meeting, and on his way therefrom towards his home he gave vent to his feelings and stated that he intended to obtain his brother, the other defendant, and the two would avenge his imaginary or actual grievances, and which testimony as so given by him was not objected to. Directly thereafter the two met, and they returned to the church and tarried there when it was almost if not completely dark, and, as the prosecuting witness passed on his return from the store, the assault was begun by defendants making the first advancement, according to the great preponderance of the testimony. We repeat that under such facts the jury was authorized to conclude that the conspiracy was formed after the meeting of the two defendants to do what they later undertook. As we interpret the brief of defendants' counsel, he admits that

his clients were to blame for the recounter at the church, but he insists that there was no conspiracy between them to enter into it.

Having reached the conclusion that he is mistaken in his later contention, it follows that the judgment should be and it is affirmed.